Appeal Nos. 15-1189, 15-1227

# United States Court of Appeals

*for the*

# Federal Circuit

_____

INVENTIO AG,

*Plaintiff-Appellant,*

- v. -

THYSSENKRUPP ELEVATOR CORPORATION,

*Defendant-Appellee-Cross-Appellant*

THYSSENKRUPP ELEVATOR AMERICAS CORPORATION and
THYSSENKRUPP ELEVATOR MANUFACTURING INCORPORATED.

*Defendants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IN CASE NO. 08-CV-00874,
JUDGE RICHARD G. ANDREWS

**RESPONSE AND REPLY BRIEF
OF PLAINTIFF-APPELLANT INVENTIO AG**

PIERRE R. YANNEY
STROOCK & STROOCK & LAVAN, LLP
180 Maiden Lane
New York, New York  10038-4982
(212) 806-5400

*Attorneys for Plaintiff-Appellant
INVENTIO AG*

JUNE 5, 2015

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Inventio AG    v.  ThyssenKrupp Elevator America

No. 15-1189

## CERTIFICATE OF INTEREST

Counsel for the ~~(petitioner)~~ (appellant) ~~(respondent) (appellee) (amicus)~~ (name of party)
Inventio AG _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Inventio AG

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A - Inventio AG is the real party in interest who is represented by me.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Inventio AG is 100% owned by its parent corporation, Schindler Holding AG.

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

FROM STROOCK & STROOCK & LAVAN LLP - Pierre R. Yanney, Stephen Underwood, Ian G. DiBernardo and Jennifer J. Arbuse
FROM MORRIS, NICHOLS, ARSHT & TUNNELL LLP - Donald E. Reid and Michael J. Flynn
FROM DARBY & DARBY P.C. (prior law firm of counsel for Appellant) - Pierre R. Yanney and Stephen Underwood

12/29/2014
_____
Date

/s/ Pierre R. Yanney
_____
Signature of counsel

Pierre R. Yanney
_____
Printed name of counsel

Please Note: All questions must be answered
cc: Counsel of Record _____

124

# **TABLE OF CONTENTS**

I.    RESPONSE TO THYSSENKRUPP'S STATEMENT OF FACTS ...............1

II.   SUMMARY OF THE ARGUMENT ........................................................7

III.  ARGUMENT .......................................................................................7

    A.    This Court Should Grant Judgment of Nonobviousness.......................7

        1.    Inventio Is Not "Precluded" from Challenging
            Obviousness of Claims 2 and 3 of the '465 Patent....................7

        2.    ThyssenKrupp Misstates the Relevant Legal Standards............8

        3.    ThyssenKrupp Misrepresents the Content of the Prior Art ......13

        a. So-Called "Prior Art Overlay Modernization" ................13
        b. Schroeder...................................................................19
        c. Fortune .....................................................................21
        d. Ovaska......................................................................23
        e. Lustig........................................................................24
        f. 1989 Wolfe Article.....................................................25
        g. 1996 Arora Article .....................................................25
        h. 1988 Schroeder Patent.................................................26
        i. '094 Patent................................................................26
        4.    ThyssenKrupp Failed to Show Where All the Claim
            Elements Could be Found in the Prior Art ..............................26

        a. "Modernizing Device" ................................................26
        b. '861 Patent, Claim 3...................................................30
        5.    ThyssenKrupp Failed to Identify a Particular
            Combination of References that Met All the Claim
            Elements..............................................................................31

        6.    ThyssenKrupp Failed to Adduce Substantial Evidence of
            a Non-Hindsight Obviousness Rationale..................................32

        7.    This Court Should Grant Judgment of Nonobviousness ..........35

    B.    Alternatively, This Court Should Grant a New Trial on
        Obviousness........................................................................35

1.      Inventio Was Barred from Presenting its Evidence of
        Secondary Considerations.........................................................35

2.      The Exclusion of Inventio's Secondary Evidence Was
        Error ...................................................................................38

3.      The District Court's Error Was Not Harmless .........................43

C.      This Court Should Grant Judgment of No Best Mode Violation
        as to the '861 Patent ..............................................................44

1.      No Reasonable Jury Could Have Found for
        ThyssenKrupp on the Subjective Prong...................................44

2.      No Reasonable Jury Could Have Found for
        ThyssenKrupp on the Objective Prong.....................................47

D.      This Court Should Grant Judgment of Infringement as to the
        Asserted Claims of the '861 Patent ......................................49

E.      This Court Should Affirm the Findings of Infringement as to
        the '465 Patent......................................................................51

F.      This Court Should Affirm the Finding of No Inequitable
        Conduct ...............................................................................54

IV.    CONCLUSION ............................................................................56

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Adenta GmbH v. OrtohArm, Inc.*,
    501 F.3d 1364 (Fed.Cir. 2007) ....................................................*passim*

*Allied Colloids Inc. v. Am. Cyanimid Co.*,
    64 F.3d 1570 (Fed.Cir.1995) ...............................................................55

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
    651 F.3d 1318 (Fed.Cir. 2011) ...........................................................54

*In re Antonie*,
    559 F.2d 618 (CCPA 1977) ...................................................................6

*Ashland Oil, Inc. v. Delta Resins & Refractories Inc.*,
    776 F.2d 281 (Fed. Cir. 1985) ......................................................13, 17

*Barker v. Deere & Co.*,
    60 F.3d 158 (3d Cir. 1995) ..................................................................43

*Consol. Aluminum Corp. v. Foseco Intern. Ltd.*,
    910 F.2d 804 (Fed. Cir. 1990) .............................................................55

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012) ...............................................8, 47, 48

*Dow Chem. Co. v. Mee Indus., Inc.*,
    341 F.3d 1370 (Fed. Cir. 2003) .......................................................3, 18

*Ecolab USA Inc. v. Diversey, Inc.*,
    No. 12-CV-1984(SRN/FLN), 2015 WL 2353018 (D. Minn. May 15, 2015)
    ....................................................................................................38, 39, 40

*Eli Lilly & Co. v. Barr Laboratories, Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) .......................................................47, 56

*Fireman's Fund Ins. Co. v. Videfreeze Corp.*,
  540 F.2d 1171 (3d Cir. 1976) ............................................................8

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) ....................................................9, 30

*Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
  618 F.3d 1294 (Fed. Cir. 2010) ......................................................21

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
  381 F.3d 1142 (Fed. Cir. 2004) ........................................................9

*LadaTech LLC v. Illumna, Inc.*,
  Civ. No. 09-627-SLR, 2012 WL 2153646 (D. Del. Jan. 24, 2012).............40, 42

*Lockhart v. Westinghouse Credit Corp.*,
  879 F.2d 43 (3d Cir. 1989) ..............................................................43

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ......................................................52

*Meyer Intellectual Properties Ltd. v. Bodum, Inc.*,
  690 F.3d 1354 (Fed. Cir. 2012) ......................................................41

*Mintz v. Dietz & Watson, Inc.*,
  679 F.3d 1372 (Fed. Cir. 2012) ......................................................30

*Morpho Detection, Inc. v. Smiths Detection, Inc.*,
  957 F.Supp.2d 655 (E.D.Va. 2013) ............................................39, 40

*Osram Sylvania, Inc. v. Am. Induction Technologies, Inc.*,
  CV 09-8748-R, 2011 WL 5143630 (C.D. Cal. Oct. 28, 2011) ........................54

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed.Cir. 2007) ........................................................12

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013) ......................................................51

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
  566 F.3d 989 (Fed. Cir. 2009) ....................................................43, 44

*Spectra-Physics, Inc. v. Coherent, Inc.*,
  827 F.2d 1524 (Fed.Cir. 1987) .............................................................48, 49, 51

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ...........................................................54

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling
  USA, Inc.*,
  699 F.3d 1340 (Fed. Cir. 2012) ...................................................38, 40

*Unigene Labs, Inc. v. Apotex, Inc.*,
  655 F.3d 1352 (Fed. Cir. 2011) ...................................................34, 35

*Wahl Instruments, Inc. v. Acvious, Inc.*,
  950 F.2d 1575 (Fed. Cir. 1991) ...................................................45, 46

## Statutes

35 U.S.C. § 103 ...................................................................................12

## Other Authorities

Fed. R. Civ. P. 50(a).........................................................................24, 25

## I.    RESPONSE TO THYSSENKRUPP'S STATEMENT OF FACTS

ThyssenKrupp's counterstatement of facts includes a number of misstatements and omissions which require responses.

First, ThyssenKrupp asserts that "Inventio's description of Schindler AG and SEC . . . is not supported by the cited record." D.I. 21 at 4. That is incorrect. The evidence showed that Schindler AG is the ultimate parent of the Schindler group, and SEC is Schindler's operating entity in the United States. A9279. The evidence also showed that Inventio is a subsidiary of Schindler AG which owns all Schindler IP worldwide, including Schindler's U.S. patents. A9854 Thus, as Inventio correctly stated, the Patents-in-Suit are "Schindler patents."

Second, ThyssenKrupp asserts that Inventio refers to "conventional-to-conventional . . . modernization" as "phased modernization." D.I. 21 at 5. That is incorrect. Inventio uses "Phased Modernization" to refer to <u>conventional-to-destination modernizations</u>. A9343:5-21. Even ThyssenKrupp acknowledges this later in its brief, stating "Inventio uses the term 'Phased Modernization' as shorthand for subject matter covered by the asserted claims." D.I. 21 at 49.

Third, ThyssenKrupp devotes several pages to what it calls "[t]he prior art overlay modernization process . . . described by Mr. McClendon." D.I. 21 at 5. Mr. McClendon described this "prior art overlay modernization process" by referring to several PowerPoint slides. *Id.* at 5-9. However, these slides were merely demonstrative exhibits. They were not evidence. As such, they cannot establish what was in the prior art.

1

Fourth, relying on these demonstrative slides (and Mr. McClendon's unsupported testimony about them), ThyssenKrupp asserts that "the prior art solution to the problem" of allowing a "new computer . . . [to] communicate with [an] old elevator control" was to use a "temporary 'overlay.'" D.I. 21 at 7. However, as shown in Section III.A.3.a *infra*, "overlay" is a term that means many different things. ThyssenKrupp argues that a POSITA would know that a "temporary overlay" was the type of device shown in the PowerPoint slides. However, no competent evidence was adduced to support this conclusion.

Fifth, ThyssenKrupp asserts that "temporary overlays . . . had been done since 1982, as shown in the Fortune, Arora and Lustig prior art." D.I. 21 at 8. However, as shown in Section III.A *infra***,** none of these references describe an "overlay" that corresponds to ThyssenKrupp's "prior art overlay modernization."

Sixth, ThyssenKrupp argues that there was no need to provide "corroborating evidence" for Mr. McClendon's testimony about the demonstrative slides. D.I. 21 at 10. ThyssenKrupp acknowledges that, in *Adenta GmbH v. OrtohArm, Inc.*, 501 F.3d 1364, 1371 (Fed.Cir. 2007), this Court said that "a patent cannot be invalidated based on one person's testimony alone without corroborating evidence, particularly documentary evidence." *Id.* ThyssenKrupp attempts to distinguish *Adenta* on the grounds that it "involved anticipation, not obviousness." D.I. 21 at 10, n. 4. However, this Court has made it clear that the requirement of corroboration applies to oral testimony offered for purposes of obviousness, just as

it applies for purposes of anticipation. *See, e.g., Dow Chem. Co. v. Mee Indus., Inc.,* 341 F.3d 1370, 1378 (Fed. Cir. 2003).

Seventh, ThyssenKrupp offers a list of "evidence" (D.I. 21 at 11-13) which it incorrectly asserts to have "corroborated" Mr. McClendon's testimony, i.e:

* ThyssenKrupp notes that Mr. McClendon provided certain testimony "as a fact witness." D.I. 21 at 11. That is true. Inventio's argument, however, is that ThyssenKrupp failed to adduce sufficient <u>other</u> evidence to corroborate Mr. McClendon's "fact" testimony. Mr. McClendon was the only witness who testified for ThyssenKrupp on the issue of obviousness. Thus, some <u>other</u> evidence, "particularly documentary evidence," was required to corroborate his testimony. *Adenta*, 501 F.3d at 1371.

* ThyssenKrupp asserts that "Inventor Friedli admitted that using computerized overlays for conventional-to-conventional modernization was very common before his patents were filed." D.I. 21 at 12. However, the "overlays" Dr. Friedli referred to were <u>completely different</u> from the "modernizing device" of the Patents-in-Suit. Dr. Friedli understood the term "overlay" to refer to "very complicated" devices that "go deep" into the existing elevator controllers, A9378:19-A9379:6, and involve attaching large numbers of wires deep in their internal circuitry. A14486. Dr. Friedli testified that these "deep" overlays required "shutting down the building" for several weeks or months. A9376:11-15. He contrasted these conventional, "deep" overlays with the "modernizing device" of the claimed invention, which is "simple," does not require extensive knowledge of

the underlying equipment, and can be installed in a few hours, without shutting down the building. A9380:8-19.

- ThyssenKrupp asserts that "[d]uring opening statement[s], ThyssenKrupp's counsel gave a detailed explanation of prior art overlay modernization (A9256:7-A9261:11)." D.I. 21 at 12. However, ThyssenKrupp's opening statement is <u>not evidence</u>. ThyssenKrupp appears to assert that Dr. Friedli "adopted" ThyssenKrupp's opening statement description of "prior art overlays" by saying, "when you modernize from conventional to conventional you can do something what Mr. Schmit showed with these overlays." D.I. 21 at 12. That is incorrect. Dr. Friedli made this statement in the midst of a long narrative about "[his] involvement with modernization." A9304:19-9307:21. His off-hand reference to "what Mr. Schmit showed" was not intended to adopt ThyssenKrupp's entire opening statement as Dr. Friedli's own testimony. In fact, immediately after making this statement, Dr. Friedli contrasted "what Mr. Schmit showed" against "conventional <u>to destination</u> control," which is the <u>actual</u> subject of the invention. A9306:16-9307:21. As Dr. Friedli explained, "what Mr. Schmit showed" in the conventional-to-conventional context <u>would not work</u> in the conventional-to-destination context. *Id.* Thus, far from "corrobrat[ing] counsel's explanation of [the so-called] prior art overlay modernization process," Dr. Friedli's testimony <u>distinguished</u> his invention from "what Mr. Schmit showed."

- ThyssenKrupp asserts that "[o]ne of the known significant advantages of using prior art overlay modernization was to maintain elevator capacity during

4

modernization." D.I. 21 at 12-13. As support, ThyssenKrupp cites to A9969:23-A9971:5. However, nothing in this passage actually supports what is asserted. *Id.*

- ThyssenKrupp claims that Dr. Friedli testified that "in conventional-to-conventional modernization, the reduction in capacity problem could be addressed through the use of overlays," *citing* A9306:18-21. D.I. 21 at 13. In the cited passage, however, Dr. Friedli said no such thing. Once again, ThyssenKrupp appears to suggest that Dr. Friedli adopted ThyssenKrupp's opening statement as his own testimony, simply by referring to "what Mr. Schmit showed." D.I. 21 at 13. That is not correct.

Eighth, ThyssenKrupp asserts that "Inventio admits [that] the 'problem' addressed by the Inventio patents" was "upgrading elevators from conventional to destination dispatch." D.I. 21 at 14. Inventio made no such admission. The actual "problem to be solved," as stated in Inventio's Opening Brief, was "to upgrade an elevator installation from conventional to destination dispatch, <u>without causing undue disruption to the building</u>." D.I. 15 at 4. The first part of this "problem" – "how to upgrade an elevator installation from conventional to destination dispatch" – had <u>already been solved</u> by the time the Patents-in-Suit were filed.

Throughout the 1990s, two ways were known to modernize a conventional building to destination dispatch: (i) shut down the building for the entire period of modernization (A9306:16-23); or (ii) shut down the building for several weeks to install Destination Dispatch on some elevators, setting up "split groups" -- an inefficient approach -- in which some elevators run on conventional equipment,

and others run on new destination dispatch equipment (A9306:21-9307:21). The issue with both of these approaches was that they caused undue disruption to the tenants in the building.  A9306:16-9307:21, A9383:18-22. Thus, the "problem" to be solved was not simply to upgrade from conventional to destination dispatch – it was to do so <u>without disrupting the operation of the building</u>. ThyssenKrupp omits this key aspect of the problem to be solved.  D.I. 21 at 14-15.

Ninth, ThyssenKrupp asserts that "[t]he 'modernizing devices' . . . [are] the only part of th[e claimed] arrangement that Inventio claims Inventor Friedli 'invented.'" D.I. 21 at 15. That is not true. The claimed invention is the entire system or method recited in the Asserted Claims. No one element of the claims "is" the claimed invention.  *In re Antonie*, 559 F.2d 618, 620 (CCPA 1977).

Tenth, ThyssenKrupp asserts that "Inventio told the Patent Office that '[t]he present invention . . . is a modernizing device that is temporarily connected to an existing elevator installation.'" D.I. 21 at 15. ThyssenKrupp quotes from an Amendment filed during prosecution of the '861 patent. However, this portion of the prosecution history was never shown or presented to the jury; thus, it is too late for ThyssenKrupp to rely upon it now. Moreover, this statement from the prosecution history was not intended to mean that the <u>entire</u> claimed invention was the "modernizing device." It was simply a shorthand reference by Inventio's prosecution counsel. Clearly, both Inventio's attorney and the Examiner knew and understood that the invention was the totality of elements recited in the claims.

## II.    SUMMARY OF THE ARGUMENT

1.    ThyssenKrupp failed to prove obviousness of the Asserted Claims.

2.    In the alternative, Inventio is entitled to a new trial on obviousness.

3.    ThyssenKrupp failed to prove invalidity of the '861 patent claims under the best mode requirement.

4.    No reasonable jury could have found that claims 1 and 3 of the '861 patent were not infringed.

5.    Substantial evidence supports the jury verdict of infringement as to the Asserted Claims of the '465 patent.

6.    The district court correctly found no inequitable conduct.

## III.    ARGUMENT

### A.    <u>This Court Should Grant Judgment of Nonobviousness</u>

#### 1.    Inventio Is Not "Precluded" from Challenging Obviousness of Claims 2 and 3 of the '465 Patent

ThyssenKrupp asserts that "Inventio has not challenged on appeal the District Court's Final Judgment that dependent claims 2 and 3 of the '465 patent are invalid for obviousness." D.I. 21 at 17. That is not true.[1] Inventio's Notice of Appeal stated that Inventio was appealing "from the Court's Final Judgment (D.I. 604) . . . and all rulings, proceedings, orders, findings, and decisions underlying the Final Judgment." A12962. Thus, Inventio appealed all adverse decisions in the Final Judgment. One of those was the decision that "Claims 1, 2, and 3 of the '465

---

[1] It is also illogical. A patentee asserting that an independent claim is not obvious would never in their right mind concede that the <u>dependent</u> claims are obvious.

patent are invalid for obviousness." A19 (emphasis added). Thus, Inventio appealed the judgment of obviousness as to these claims.

Furthermore, Inventio's Opening Brief expressly argued that "Inventio is entitled to judgment of nonobviousness for all claims," including claims 2 and 3 of the '465 patent. D.I. 15 at 27, 32. Thus, there was no waiver of Inventio's nonobviousness arguments as to claims 2 and 3 of the '465 patent.

### 2.    ThyssenKrupp Misstates the Relevant Legal Standards

ThyssenKrupp asserts that, under Third Circuit law, this Court should review the evidence of obviousness "not for its sufficiency to support a finding, but rather for its overwhelming effect." D.I. 21 at 19 (*citing Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1177 (3d Cir. 1976)). However, the "overwhelming effect" rule only applies to issues on which the party seeking to overturn the jury's verdict had the burden of proof at trial. *Fireman's Fund*, 540 F.3d at 1177. Here, the burden to prove obviousness at trial (and at every stage of this litigation) is on ThyssenKrupp. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.,* 676 F.3d 1063, 1078 (Fed. Cir. 2012). Thus, the "overwhelming effect" rule does not apply.

ThyssenKrupp also asserts that "Inventio fails to even mention *KSR*, the governing law for assessing obviousness, relying instead primarily on pre-*KSR* cases." D.I. 21 at 20. However, ThyssenKrupp has not identified any specific pre-*KSR* holding that Inventio relied upon which was overturned by *KSR*. In fact, many of the pre-*KSR* cases that Inventio relies upon have been expressly approved by

this Court in post-*KSR* decisions.  For instance, this Court's holding in *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142 (Fed. Cir. 2004) that a patent challenger must "articulate how [a prior art] reference anticipates or makes obvious the [claims of the] patent" was expressly approved in *Fresenius USA, Inc. v. Baxter Int'l, Inc*., 582 F.3d 1288, 1300 (Fed. Cir. 2009), a post-*KSR* case.

Moreover, most of the obviousness cases cited by Inventio were decided after *KSR*. For example, Inventio has cited the post-*KSR Fresenius* case for the proposition that ThyssenKrupp had to "clearly disclose, discuss, and identify" where each element of the Asserted Claims could be found in the prior art. ThyssenKrupp asserts that "Inventio's characterization of *Fresenius* . . . misstates that case," but ThyssenKrupp does not identify any particular "misstatement." That is because Inventio's characterization of *Fresenius* was accurate.

In *Fresenius*, some claims required a "stepper motor." *Fresenius,* 582 F.3d at 1300. This Court found there was "no testimony wherein any witness discussed a 'stepper motor.'" *Id*. The challenger argued such testimony was unnecessary, because a prior art "manual, which was submitted to the jury, discloses the necessary [stepper motor]." *Id*. This Court rejected that argument, finding that "even if . . . [a] manual disclosed a stepper motor . . . it was Fresenius's burden to clearly disclose, discuss, and identify for the jury" where the "stepper motor" was disclosed in the manual. *Id*. Thus, the *Fresenius* case stands for the proposition that ThyssenKrupp had the burden to "clearly disclose, discuss and identify for the jury" where in the cited prior art references each claim element could be found. *Id*.

9

ThyssenKrupp also objects to Inventio's citation of the post-*KSR Innogenetics* case.  D.I. 21 at 20-21, n. 8. According to ThyssenKrupp, *Innogenetics* is not applicable because, in that case, "the expert merely listed a number of prior art reference[s], and concluded 'it would have been obvious' to perform the claimed method" over some unspecified subset of those references. D.I. 21 at 20-21, n. 8. However, that is <u>exactly</u> what Mr. McClendon did in this case. This can readily be seen from the demonstrative slides that ThyssenKrupp displayed to the jury at the end of Mr. McClendon's testimony.  D.I. 21 at 38. ThyssenKrupp argues that these slides "show[ed] the jury the specific combination of prior art it was using in its obviousness claim limitation analysis." *Id.* However, all that these slides <u>actually</u> showed is (using the slide pertaining to the "modernizing device" (A10784) as an exemplar  (D.I. 21 at 38)):

**"MODERNIZING DEVICE" REQUIREMENT**

|  |  | FOUND IN "PRIOR ART" (OBVIOUSNESS) | DIFFERENCES FROM THYSSENKRUPP INSTALLATIONS (NON-INFRINGEMENT) |
|---|---|---|---|
| '465 patent, claim 1 | c. installing at least one *modernizing device* and *connecting the at least one modernizing device to said floor terminals* and said at least one computing unit  for reading the destination signal, *for converting the destination signal into at least one call report* and for controlling the elevator control by way of the call report. | ✓ An overlay/interface circuit<br>✓ Use of temporary overlays well known in prior art<br>✓ 1994 Ovaska '857 patent<br>✓ 1990 Lustig paper<br>✓ 1990 Schroder article | ✓ Modernizing device not connected to floor terminals |
| 861 patent, claim 1 | a *modernizing device* temporarily connected to the elevator control controlling the elevator in response to the call reports,<br>* * *<br>said *modernizing device converting said destination signal into a call report* and generating said call report to the elevator control for controlling the elevator. | ✓ Use of overlay with destination dispatch<br>✓ 1990 Schroder article<br>✓ 1990's Miconic 10 brochure<br>✓ Converting signals known<br>✓ 1994 Ovaska '857 patent<br>✓ Obvious overlay design<br>✓ Connecting overlay to input device (bus approach)<br>✓ Ovaska '857 |  |

As seen above, all that ThyssenKrupp did in these slides was block-quote several large passages of claim text (in the left-hand column), and then string-cite <u>thirteen different</u> prior art references (or alleged "prior art" techniques/devices) that allegedly disclosed those limitations. All of ThyssenKrupp's "obviousness" demonstrative slides share this same deficiency. *See* A10780-10794.

In these slides, ThyssenKrupp did not identify <u>where</u> in the cited references (e.g., "Ovaska, col. X, line Y") any given claim element could be found. ThyssenKrupp did not identify <u>which</u> claim elements (out of the many elements in the block-quoted text) were found in <u>which</u> references. ThyssenKrupp did not even indicate which <u>component or element</u> of the cited references (e.g., "device X described in Fortune") was being relied upon to invalidate the claims. Rather, ThyssenKrupp simply listed the prior art references, and then <u>left it to the jury</u> to piece together which disclosures might be relevant.

This is <u>exactly</u> the type of obviousness testimony that this Court found inadequate in *Innogenetics*. Just as in *Innogenetics*, Mr. McClendon "merely list[ed] a number of prior art references," and then left it to the jury to determine which references might be relevant to the claim elements. *Innogenetics*, 512 F.3d at 1373. Therefore, as in *Innogenetics*, "[i]t is not credible to think that a lay jury[2]

---

[2] It is worth noting that the lay jury in this case concluded that Dr. Friedli's colleague, Dr. Schroeder, should have been listed as a co-inventor on the Patents-in-Suit, even though he had died <u>ten years before they were filed</u>. *See* A55 (verdict), A9299 (Dr. Schroeder died in 1990). ThyssenKrupp conceded on post-trial motions that this verdict was erroneous. *See* A41.

could examine the [references] . . . and determine on its own whether there were differences among them and the [claimed subject matter]." *Id.* Accordingly, Mr. McClendon's "vague testimony would not have been helpful to a lay jury in avoiding the pitfalls of hindsight that belie a determination of obviousness." *Id.*

ThyssenKrupp also asserts that "Inventio does not challenge the ultimate legal conclusion of obviousness, but only certain of its factual underpinnings." D.I. 21 at 20. That is incorrect. Inventio's Notice of Appeal appealed all adverse findings in the Final Judgment.  A12962. This includes the district court's <u>legal</u> conclusion that all the asserted claims "are invalid for obviousness under 35 U.S.C. § 103." A19. Clearly, Inventio is appealing both the sufficiency of the factual support for the jury's verdict of obviousness, and the correctness of the district court's legal conclusion of obviousness.

Finally, ThyssenKrupp asserts that Inventio "introduced no evidence at all in response to ThyssenKrupp's *prima facie* obviousness showing." D.I. 21 at 21.[3] That is incorrect. Inventio's technical expert, Dr. Koopman, testified in rebuttal to ThyssenKrupp's obviousness case.  A10304-10311. In any event, Inventio had no "burden" to come forward with evidence of nonobviousness, because ThyssenKrupp never made out a *prima facie* case of obviousness. *See  Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed.Cir. 2007).

---

[3] ThyssenKrupp quotes the district court, which found that "Plaintiff's expert provided no structured obviousness analysis." D.I. 21 at 21. However, even if that were true, providing "no structured obviousness analysis" is not the same as providing "no evidence <u>at all</u>," as ThyssenKrupp asserts.

### 3.     ThyssenKrupp Misrepresents the Content of the Prior Art

ThyssenKrupp vastly overstates the quantity and quality of evidence that it adduced to show the content of the prior art.[4] Inventio addresses each cited piece of prior art in turn.

#### a.  So-Called "Prior Art Overlay Modernization"

ThyssenKrupp asserts that it "was undisputed at trial that conventional-to-conventional elevator overlay modernization" – i.e., the alleged "prior art overlay modernization" in ThyssenKrupp's demonstrative slides – "was well-known before the Inventio patents." D.I. 21 at 22-23. That is not true.

The only "evidence" adduced to show that the technique in ThyssenKrupp's demonstrative slides existed in the prior art was the <u>uncorroborated, generalized testimony</u> of the <u>designer of ThyssenKrupp's infringing equipment</u>, Steve McClendon.[5] Such uncorroborated testimony, by an interested witness, is inadequate to establish obviousness. *See Adenta*, 501 F.3d at 1371.[6]

---

[4] ThyssenKrupp asserts that "Inventio did not challenge the contents of any of ThyssenKrupp's prior art." D.I. 21 at 22. It is unclear what that even means. Regardless, it was not Inventio's burden to "challenge" the content of the prior art – it was ThyssenKrupp's burden to <u>establish</u> the content of the prior art. *Ashland Oil, Inc. v. Delta Resins & Refractories Inc*., 776 F.2d 281, 291 (Fed. Cir. 1985).

[5] It is also worth noting that Mr. McClendon was essentially ordered by his employer, against his will, to serve as ThyssenKrupp's expert in this case, for no extra compensation. *See* A9950-9952. Under these circumstances, it is difficult to see how Mr. McClendon could have offered truly unbiased testimony.

[6] ThyssenKrupp also asserts that the "level of ordinary skill [in the art] was relatively high," but does not point to any <u>specific</u> things a POSITA would know that would render the claims obvious. D.I. 21 at 21. In addition, the only evidence

Contrary to ThyssenKrupp's assertions, "overlay modernization" did not refer to one particular, well-defined technique in the art. Indeed, "overlay" does not even have a well-known meaning in the elevator industry. According to an ASME publication, "the term 'overlay' is neither defined nor used anywhere in ASME A17.1.[7]" A12743. Moreover, "overlay" does not appear anywhere in the Patents-in-Suit. ThyssenKrupp never presented any evidence, such as textbooks or manuals, that gave an accepted definition of "overlay." Thus, on the evidence presented, "overlay" did not have a well-understood meaning in the art.

This is confirmed by Mr. McClendon's vague, confusing and contradictory testimony on "overlays." According to Mr. McClendon, the "prior art conventional overlay" was the "device in purple" on ThyssenKrupp's slide 14, and the "purple box" on slide 15. A9965:5-11, 20-24. Without citing any actual prior art, Mr. McClendon alleged that this "purple box" was known, and that it converted serial information from the new group dispatcher into discrete signals that could be read by the old per-car elevator controller. A9965:20-A9966:15.

Mr. McClendon then discussed the 1985 Fortune article, "Overlays" (A14486-A14489). Mr. McClendon testified that Fortune used "overlay" to refer to "these [same] overlays that we've just been talking about." A9972:10-15.

---

of the alleged "relatively high" level of skill was Mr. McClendon's uncorroborated, *ipse dixit* testimony.

[7] ASME A17.1 is the standard U.S. safety code for elevator and escalators, which is widely adopted throughout the United States. A12740.

That is not true. Fortune defines an "overlay" as a "<u>new group dispatch panel</u> that . . . simply takes over the elevator dispatching system." A14486. Thus, Fortune uses "overlay" to refer to the <u>new group dispatcher</u> installed at the beginning of modernization – <u>not</u> an "interface adapter," as ThyssenKrupp asserts. Fortune calls the portion of the system that interfaces between the "overlay" and the old car controllers the "input/output optical devices (I/O ports)." *Id.* Fortune differentiates the "I/O ports" from the "overlay." *Id.* Fortune states that "the interfacing usually consists of connecting 75 to 100 wires <u>from</u> the new microprocessor overlay control <u>to</u> each car controller." *Id.* That is, "the interfacing" sits <u>between</u> the "overlay" and "each car controller." Thus, Fortune's "overlay" is <u>not</u> a "purple box" interfacing between a new group control and old car controllers – it is the new group control itself. As such, Fortune does not corroborate ThyssenKrupp's claim that a POSITA would understand "overlay" to refer to the "purple box" on ThyssenKrupp's demonstrative slides. A9972:10-15.

Mr. McClendon's testimony about Ovaska introduced even more confusion about "overlays." Mr. McClendon testified that Ovaska shows "the use of an overlay in a conventional [to] conventional modernization." A9980:6-10. Mr. McClendon asserted that Ovaska's "overlay" was the purple-highlighted portion of Figure 3, shown on demonstrative slide 19. A9981:3-12, A10715. This slide defines the "overlay" to be the "elevator computer[s] 6" and "I/O adapters 16." *Id.*

However, in Ovaska, the "elevator computers 6" are the <u>new-per car controllers</u>, which are installed at the beginning of modernization, and remain in

place after modernization. *See* A14480, 4:21-30, A14481, 5:30-46, Fig. 6. In the "fully modernized system" of Ovaska – i.e., after modernization is done - the "elevator computers 6" <u>remain in place,</u> serving as the new car controllers. A14477. This is confirmed by Dr. Koopman, who stated in unrebutted testimony that "Ovaska is about . . . putting in <u>completely new elevator controllers</u> up front. And that's certainly not what the Friedli patents talk about." A10307:21-24.

Thus, the "elevator computers 6" in Ovaska cannot be the "purple box" in ThyssenKrupp's demonstrative slides, because the "purple box" is a <u>temporary</u> interface between a new group dispatcher and an old per-car controller, whereas the "elevator computers 6" are the <u>permanent, new per-car controllers</u>. A14477. Moreover, as shown in Section III.A.3.d *infra*, the "I/O adapters 16" in Ovaska are <u>not</u> part of any "overlay." Thus, Ovaska provides no support for the proposition that Mr. McClendon's "purple box" overlay existed in the prior art.

The Arora article introduces yet more different definitions of "overlay." Arora states that "<u>various</u> overlay systems have made appearances," all having different characteristics. A14554. This contradicts ThyssenKrupp's assertion that the word "overlay" referred to a single, well-known technique. In fact, Arora introduces two different "overlay" techniques. The first, shown in Fig. 1, is unlike anything else Mr. McClendon called an "overlay" – it involves a "bi-directional ring," as well as multiple "modular overlays." A14553. Meanwhile, Fig. 2 shows a system where the "overlay" is a "dispatcher overlay" connected at the group level – similar to Fortune – but also having a "group interface" to the original group

controller. A14554. Thus, Arora introduces at least two different types of overlay, neither of which correspond to Mr. McClendon's "purple box."

Finally, Dr. Friedli testified about yet another type of "overlay," which was made by "companies that specialized in overlay modernization," such as "Millar." A9376:19-24. These overlays worked "by shutting down the building" during modernization. *Id.* (emphasis added). Dr. Friedli testified:

> Q.  My question to you is how did Schindler use an overlay with a destination dispatch system before you came up with the idea that's in your patent?
>
> A.  Before?  We couldn't do a -- we had to shut down the whole system.  For instance, the first what you mentioned here, that was closed during the whole Christmastime, from Christmas to something in January.

A9380:8-16. Dr. Friedli testified that the "Millar"-type overlay, which was the only "prior art overlay" he knew of, had to "go deep into [the elevator controls]." A9341:4-6. These "deep" overlays were "very complicated," and had to be "adapted on both sides [of] the controller." A9379:4-6.[8]

Dr. Friedli contrasted these conventional, "deep" overlays with the claimed "modernizing device," which is "simple," does not require extensive knowledge of

---

[8] The fact that overlays of the time went "deep" into the underlying equipment is confirmed by Arora, which states: "[a] successful implementation of an overlay requires extensive knowledge of the old system." A14554. Arora states that, without this "extensive knowledge," "fitting an overlay . . . can lead to disaster." *Id.* Similarly. Fortune states that interfacing to his overlay required "75 to 100 wires" per old car controller – which involves going "deep." *See* A14487.

the underlying equipment, and provides a "general purpose way . . . to interface []
to virtually any elevator, conventional elevator, in the world." A9310:4-11

In sum, based on the evidence adduced at trial, "prior art overlays" could
refer to (at least) any of the following:

- "Deep," Millar-type overlays which required "shutting down the
  building;"

- A new conventional group dispatcher, as in Fortune;

- New per-car elevator controllers, as in Ovaska;

- The "bi-directional ring" system of Arora Fig. 1; or

- The "dispatcher overlay" system of Arora Fig. 2.

Thus, contrary to Mr. McClendon's testimony, "conventional overlay
modernization" did not refer to a single, well-known technique in the art. Rather, it
meant many different things. Regardless, none of the types of "overlay
modernization" disclosed in the prior art of record correspond to the "purple box"
in ThyssenKrupp's demonstrative slides.

Therefore, Mr. McClendon's testimony about the "prior art overlay
modernization" technique shown in ThyssenKrupp's demonstrative slides is
uncorroborated by any real evidence. "Corroboration is required of any witness
whose testimony alone is asserted to invalidate a patent." *Dow Chem.* 341 F.3d at
1378. Therefore, Mr. McClendon's testimony on "prior art overlay modernization"
is not competent evidence of the content of the prior art.

### b. Schroeder

ThyssenKrupp asserts that the Schroeder article was "extensively discussed and analyzed at trial." D.I. 21 at 23. However, Schroeder provides <u>no technical detail whatsoever</u> about "overlays" or "overlay modernization."

Schroeder was an article – more in the nature of a marketing piece - in *Elevator World*, attributed to Dr. Joris Schroeder of Schindler (now deceased). The Schroeder article was primarily an advertisement for Schindler's then-new Miconic 10 product. A14506-A14519. ThyssenKrupp focuses on one short paragraph near the end of the article. D.I. 21 at 23-25. This paragraph reads, in full:

> "M10" [Miconic 10] can be applied in "overlay" form to modernizations, or it can be supplied with new equipment. The "overlay" application is particularly attractive as a first stage of a complete modernization program: The "overlay" stage will boost the handling capacity of the elevator system, thus making the second time-consuming stage of drive replacements less annoying to building tenants, with one elevator after the other out of operation for an extended period of time. "M10" "overlays" can be put into operation quickly and without interrupting elevator service (except for a few hours).

A14151. This is the sum total of Schroeder's disclosure about "overlays."

Schroeder says nothing about what the referenced "overlay" actually <u>is</u>. It says nothing about what the "overlay modernization" technique entails. It does not provide any pictures, diagrams, or technical descriptions of the "overlay." It does not say whether the "overlay" is temporary or permanent. It does not explain what is meant by a "complete modernization program," or by "a first stage." It does not

describe whether the "overlay" provides an interface to existing per-car controllers – in fact, it does not mention existing per-car controllers at all.

There is a reason why Schroeder is so short on detail about this "overlay" – namely, such an overlay <u>did not exist</u> when the article was written. A9329:1-4.

On cross-examination, ThyssenKrupp's counsel asked Dr. Friedli, "Isn't it true what Dr. Schroeder was suggesting in that article was a modernization to turn the destination on first so you get the compensation for the capacity reduction?" A9394:13-16. To which Dr. Friedli replied: "[Dr. Schroeder] published something here that was <u>a dream</u>. Absolute dream. No chance. <u>It took ten years until we could do something like that.</u>" A9394:17-19.

Thus, the "overlay" mentioned in Schroeder was "a dream" at the time – it <u>did not exist</u>. As Dr. Friedli testified, "it took <u>ten years</u> until [Schindler] could do something like that" – i.e., the roughly "ten years" between Schroeder's publication in 1990 and the invention of the Patents-in-Suit in 2001. A9394:18-19. This is confirmed by Mr. McClendon, who testified that at the time of Schroeder, companies "didn't have functional destination-based dispatching systems that they were ready to apply to the modernization market." A10227-10228.

If anyone would know whether Dr. Schroeder actually possessed such an "overlay" in 1990, it is Dr. Friedli. Dr. Schroeder recruited Dr. Friedli to come to Schindler in 1977. A9463:16-22. Between 1977 and December of 1990, when Dr. Schroeder passed away, he and Dr. Friedli worked closely together to develop control equipment for Schindler. A9299:3-17. In particular, they worked to

develop the "Miconic 10"– the first commercial destination dispatch system in the world. A9299:9-17. Although Dr. Schroeder came up with the original idea behind Miconic 10, Dr. Friedli was the one who "developed it" and "made it work." A9387:3-11. Dr. Friedli was "deeply involved in developing the Miconic 10," and was "the one that got it running." A9468:14-19.

Thus, Dr. Friedli was intimately familiar with the Miconic 10. If Schindler had developed an "overlay" to work with Miconic 10 in 1990, Dr. Friedli would have known. But, Dr. Friedli unequivocally testified that such an overlay did <u>not</u> exist at the time, and Schindler would not develop it for "<u>ten years</u>."[9] A9394.

Thus, Schroeder is not competent evidence that such overlays existed in the prior art, and no reasonable jury could have relied on Schroeder (or, further removed, Mr. McClendon's testimony on it) to find the claimed invention obvious.

ThyssenKrupp asserts that, although the jury's verdict that Dr. Schroeder was a co-inventor should be overturned, "that verdict . . . reflects the fact that the Schroeder article describes the concept of the invention." D.I. 21 at 25. That makes no sense. ThyssenKrupp cannot rely on a jury finding which it <u>consented</u> to have overturned by the district court. A41.

### c.  *Fortune*

---

[9] The fact that it took "ten years" for Dr. Friedli to develop the patented invention is also evidence of a long-felt but unmet need in the industry. This is probative secondary evidence of nonobviousness. *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010).

As discussed in Section III.A.3.a *supra*, the "overlay" in Fortune does not correspond to the "purple box" in ThyssenKrupp's demonstrative slides. The "purple box" is a temporary interface between a new group controller and old per-car elevator controllers, whereas the "overlay" in Fortune is the new group controller itself. A14489. Thus, Fortune does not provide any corroboration for ThyssenKrupp's claim that the "purple box" existed in the prior art.

ThyssenKrupp notes that Fortune uses the term "phased modular modernization."  D.I. 21 at 26-27. According to ThyssenKrupp, this shows that Fortune is describing something like Inventio's "Phased Modernization" invention. *Id.* That is not true. Fortune only described conventional-to-conventional modernization, not conventional-to-destination dispatch.

Furthermore, Fortune states that a "disadvantage" of his "phased modular modernization" approach is:

> [N]o two manufacturer's overlay systems are compatible with any [equipment] other than their own, so the purchaser is substantially locked into having the overlay modernization contractor do the later equipment modernization.

A14488. Thus, Fortune's "overlay" could only be used with the equipment of a specific manufacturer. *Id.* By contrast, a main advantage of the claimed "modernizing device" is that it provides a "general purpose way . . . to interface [] to virtually any elevator, conventional elevator, in the world." A9310:4-11. This further shows that Fortune's "overlay" does not correspond to the claimed modernizing device, or the "purple box" in ThyssenKrupp's demonstrative slides.

### d. *Ovaska*

As discussed in Section III.A.3.a. *supra*, what ThyssenKrupp has called the "overlay" in Ovaska ("elevator computer 6" + "I/O Adapter 16") does not correspond to the claimed "modernizing device," or to the "purple box" in ThyssenKrupp's demonstrative slides. That is because the "elevator computers 6" are the new, permanent per-car controllers, which remain in place after modernization. *See* Ovaska, Fig. 6.

In fact, Ovaska states that:

> This system assembly, comprising the elevator computers 6 and the group control function 5 and preferably also the hall call devices 7 and a monitoring unit 8, constitutes the central part of the new control system to be installed in the elevator group at the overlay stage of the modernization.

Ovaska at 4:63-5:15. Thus, Ovaska defines its "overlay" as being the entire system installed up front, including the "elevator computers 6" (new per-car controllers), "group control function 5" (new group controller), and "hall call devices 7" (new up/down buttons).

Notably, Ovaska omits the "I/O adapters 16" from the equipment to be installed at the "overlay stage." Rather, the "adapter units 16" should be separately installed, but only if "the modernization is intended to be limited to the renovation of these central functions only." Ovaska, 5:10-15. Thus, contrary to what ThyssenKrupp claims, the "I/O adapters" are not part of Ovaska's "overlay."

ThyssenKrupp acknowledges that Dr. Koopman testified, "Ovaska is about . . . putting in completely new elevator controllers up front." A10307:21-24.

However, ThyssenKrupp asserts that the jury was "at liberty to accept or reject" that testimony. D.I. 21 at 28. That is incorrect. When the <u>only</u> competent evidence is on <u>one side</u> of an issue, the jury is <u>not</u> free to "reject" it. Fed. R. Civ. P. 50(a). Here, both Ovaska itself and Dr. Koopman show that the "elevator computers 6" are the "new elevator controllers," which are installed "up front." Ovaska, 4:63-5:15. ThyssenKrupp did not adduce any evidence to rebut this showing. Thus, a reasonable jury was <u>required</u> to find that Ovaska discloses installing the new per-car controllers ("elevator computers 6") up front. *Id.*

Accordingly, no reasonable jury could have found that Ovaska corroborates Mr. McClendon's claim that the "purple box" overlay of his demonstrative slides existed in the prior art.

### e. Lustig

The Lustig article was only briefly discussed at trial. Only two pages of this article were discussed by Mr. McClendon – pages 143 and 144. A14497-A14498.

ThyssenKrupp asserts that Lustig described "prior art overlay modernization." D.I. 21 at 28. However, just like Fortune, the "overlay" in Lustig is a <u>new, permanent group dispatcher</u> – <u>not</u> a "purple box" that interfaces between a group dispatcher and old per-car controllers. Lusting states, "[t]ypical overlay modernization is based on installation of <u>single group dispatch panel</u> . . .[which] <u>takes upon itself the dispatching system</u>." A14497. Thus, Lustig provides no corroboration for ThyssenKrupp's claim that the "purple box" overlay – an interface between group and car controllers - existed in the prior art.

Also, Lustig only describes conventional-to-conventional modernization – not conventional-to-destination dispatch modernization. A14490-A14505.

Finally, ThyssenKrupp asserts that Lustig describes "phased modernization." D.I. 21 at 28. That is not true. Neither the word "phased" nor the phrase "phased modernization" appears in Lustig, and Lustig does not describe anything substantively related to Inventio's Phased Modernization.

### f. 1989 Wolfe Article

ThyssenKrupp asserts that Wolfe "discusses the prior art forces at work in the highly competitive modernization market." D.I. 21 at 28-29. However, Wolfe does not describe anything about "overlays" or "overlay modernization." A14551-A14552. Furthermore, Wolfe only talks about the market for conventional-to-conventional modernization. *Id.* Wolfe does not say anything about conventional-to-destination dispatch modernization.

Therefore, Wolfe is not relevant prior art.

### g. 1996 Arora Article

As shown in Section III.A.3.a. *supra*, the "overlays" in Arora do not correspond to the "purple box" in ThyssenKrupp's demonstrative slides. Thus, Arora does not corroborate Mr. McClendon's claim that the "purple box" existed in the prior art.

ThyssenKrupp also asserts that Arora discusses "phased modernization." D.I. 21 at 29. That is incorrect. Neither the word "phased" nor the phrase "phased modernization" appears in Arora, and Arora does not describe anything

25

substantively related to Inventio's Phased Modernization. Furthermore, Mr. McClendon never testified that Arora described "phased modernization."

### h. 1988 Schroeder Patent

ThyssenKrupp notes that the 1988 Schroeder patent "describes the prior art destination dispatch technology." D.I. 21 at 29. Inventio agrees. However, this patent does not say <u>anything</u> about modernization or overlays, let alone modernization from conventional to destination dispatch.

### i. '094 Patent

ThyssenKrupp notes that the '094 patent describes a "destination dispatch system having 'floor terminals' . . . and 'computing units.'" D.I. 21 at 29. Inventio agrees. However, the '094 patent does not say <u>anything</u> about modernization or overlays, let alone modernization from conventional to destination dispatch.

### 4. ThyssenKrupp Failed to Show Where All the Claim Elements Could be Found in the Prior Art

### a. "Modernizing Device"

ThyssenKrupp asserts that the "modernizing device" claim element was met by "the overlay used in prior art overlay modernizations" – i.e., the "purple box" on Mr. McClendon's demonstrative slides. D.I. 21 at 31. However, these demonstrative slides were not evidence, and Mr. McClendon was the only witness who testified about them.

"A patent cannot be invalidated based on one person's testimony alone without corroborating evidence, particularly documentary evidence." *Adenta*, 501 F.3d at 1371. Thus, to show that the "purple box" existed in the prior art,

ThyssenKrupp was required to adduce some <u>documentary evidence</u> as corroboration. As shown in Section III.A.3 *supra*, <u>none</u> of the documentary evidence adduced by ThyssenKrupp corroborates Mr. McClendon's claim that the "purple box" technique was known in the art. Accordingly, no reasonable jury could have found that the "purple box" was part of the prior art, or that it disclosed the claimed "modernizing device."

ThyssenKrupp also asserts that the "elevator computer 6 + I/O adapter 16" of Ovaska meets the "modernizing device" claim elements. D.I. 21 at 31-33. That is incorrect, for several reasons.

First, as discussed above, the "elevator computers 6" are the new, permanent per-car controllers in Ovaska, which remain in place after modernization. Meanwhile, the Asserted Claims of the '861 patent recite that the "modernizing device" is "<u>temporarily connected</u>." The district court construed "temporarily" to mean "used in connection with the elevator installation during modernization, and <u>removed after modernization</u> is complete." A95. The "elevator computers 6" of Ovaska cannot meet the "modernizing device" claim requirements of the '861 patent, because they are not "removed after modernization is complete." Moreover, as discussed above, the "I/O adapters" are not part of Ovaska's "overlay."

Moreover, the <u>main purpose</u> of the claimed "modernizing device" is to allow a building to upgrade to destination dispatch <u>immediately</u>, <u>before</u> the time-consuming step of installing the new per-car controllers has begun. '861 Patent, 3:23-36. This purpose would be frustrated if, as ThyssenKrupp suggests, the

"modernizing device" could be construed to cover the new per-car controllers themselves, as in Ovaska. By teaching up-front installation of the new car controllers, Ovaska teaches away from the claimed invention. Accordingly, the "elevator computer 6 + I/O Adapters 16" of Ovaska cannot correspond to the claimed "modernizing device" in the '465 or '861 patents.

Furthermore, the Asserted Claims require the "modernizing device" to "convert" "destination signals," which are "data signal[s] providing passenger conveying information that identifies the boarding floor[10] and/or the destination floor," into "call reports," which are conventional "signal[s] providing passenger conveying information used to control the [existing] elevator control." A92-95. In other words – the "modernizing device" must take in data signals from the "computing unit" (group dispatcher) that tell the elevator where to go, and convert them into analog signals that cause the old elevator to go there. *Id.*

Ovaska does not disclose this. At no point does the "elevator computer 6 + I/O Adapter 16" of Ovaska receive, process or convert a "destination floor" signal from the group dispatcher. That is because, in Ovaska, the "destination floor" signals do not come from the group controller – they come from the in-car car call buttons, called the "car panel." A14480-A14481. Accordingly, Ovaska does not

---

[10] ThyssenKrupp asserts that "Inventio admits that . . . the prior art Ovaska patent 'discloses a data signal that identifies the 'boarding floor,'" but the only "evidence" cited to show this "admission" is the trial testimony of Mr. McClendon. *See* D.I. 21 at 33. Inventio made no such admission.

disclose the claimed requirement of a "modernizing device" that converts "destination signals" from the "computing unit" into "call reports."

ThyssenKrupp also argues that the Patents-in-Suit's instruction to use a "commercially available and proven converter of the electronics industry" amounts to an admission that the "conversion" function was known in the prior art.  D.I. 21 at 34. This argument misses the mark. The fact that the electronic hardware needed to "convert" destination signals into call reports was commercially available does not mean that the <u>claimed invention as a whole</u> was in the prior art.[11] Most, if not all, inventions are combinations of prior art elements. *KSR*, 550 U.S. at 418-419. Inventio is not asserting that the electrical equipment used to "convert" signals is the claimed invention. Rather, the claimed invention is the claimed method/system <u>as a whole</u>, utilizing such components for a particular purpose.

Interestingly, ThyssenKrupp argues that "since the modernizing device input ("destination signal") and outputs ("call reports") were already known in the prior art, it was within the ability of a POSITA <u>to design a circuit</u>" to perform the functions of the modernizing device. D.I. 21 at 34-35. The argument that a POSITA could "design" a "modernizing device" is essentially an admission that the "modernizing device" was <u>not</u> in the prior art because, if it were, there would be no need to "design" it.  Furthermore, mere knowledge of the input and output signals does not render unpatentable any later device using such signals.

---

[11]  ThyssenKrupp's logic would similarly mean that once the computer was invented, there could be no more computer-related inventions, since such inventions would utilize known electronic components or hardware.

In sum, it was ThyssenKrupp's burden to "clearly disclose, discuss and identify for the jury" where the "modernizing device" claim elements could be found in the prior art. *Fresenius*, 582 F.3d at 1300. It failed to do so. Therefore, no reasonable jury could have found the asserted claims obvious.

### b. '861 Patent, Claim 3

As discussed in Inventio's Opening Brief (D.I. 15 at 28-29), '861 patent claim 3 adds the requirement that the "modernizing device" connects to an input of the old elevator control that used to be connected to the "car call buttons," and sends "call reports" to that elevator input to control the elevator. This is directed to the "car call interface" feature – i.e., "mimicking" a car call button press, so that the old elevator travels to the desired destination floor. *Id.*

ThyssenKrupp asserts that it would have been "an obvious and commonsense step" for a POSITA to connect the "modernizing device" and existing elevator controller in this way. D.I. 21 at 36. However, "an invocation of the words "common sense" (without any record support)" <u>cannot</u> suffice to establish obviousness. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012). Thus, ThyssenKrupp's invocation of "common sense" cannot satisfy its burden of showing that this claim element was known in the prior art.

ThyssenKrupp also points to the "fact" testimony of Mr. McClendon, who said that he was "personally involved in doing overlays . . . using car call inputs." D.I. 21 at 37; A10120-10121. However, as Mr. McClendon admits, these "overlays" were "unrelated to destination dispatch." A10120:22-24. Moreover,

ThyssenKrupp did not adduce any <u>documentary evidence</u> to corroborate Mr. McClendon's claim that such "overlays" existed. Mr. McClendon's uncorroborated testimony is simply not enough. *Adenta*, 501 F.3d at 1371.

Thus, ThyssenKrupp did not carry its burden of showing that '861 patent, claim 3 was obvious.

### 5.    ThyssenKrupp Failed to Identify a Particular Combination of References that Met All the Claim Elements

ThyssenKrupp argues that it "was not required to identify a 'particular combination of references that met all the claim limitations.'" D.I. 21 at 37-38. That is incorrect. As discussed in Section III.A.2 above, <u>even after *KSR*,</u> patent challengers are required to identify a particular combination of references that meets all the claim elements. *See Innogenetics,* 512 F.3d at 1373.

ThyssenKrupp also argues that it <u>did</u> "show the jury the specific combination of prior art it was using . . .  through the compilation blow-up" demonstrative slides at the end of Mr. McClendon's testimony. D.I. 21 at 38-39. However, as discussed in Section III.A.2 above, these slides (and the corresponding testimony) did <u>not</u> identify any "particular combination of references." Rather, they were simply a "laundry list" of all the prior art that had been adduced at trial, which left it to the jury to determine which disclosures in which references met each claim element. This is exactly the type of obviousness evidence that was found inadequate in *Innogenetics*, 512 F.3d at 1373.

Thus, Inventio is entitled to judgment of nonobviousness.

### 6.   ThyssenKrupp Failed to Adduce Substantial Evidence of a Non-Hindsight Obviousness Rationale

ThyssenKrupp argues that it adduced "substantial evidence" of a non-hindsight obviousness rationale. D.I. 21 at 40-46. That is incorrect.

First, ThyssenKrupp points to the testimony of Mr. McClendon, who allegedly "placed himself in the position of a POSITA . . . and considered the 'problem' of upgrading a conventional elevator installation to destination dispatch." D.I. 21 at 41. However, as discussed above, this "problem" had already been solved – it was <u>known</u> how to modernize from conventional to destination dispatch. The "problem" solved by the invention was how to do this <u>without disrupting the operation of the building</u> – a substantially greater challenge. A9306:16-9307:21, A9383:18-22. By starting with a "problem" that had already been solved, Mr. McClendon completely divorced his testimony on the "motivation to combine" from the actual invention of the Patents in Suit.

Second, ThyssenKrupp asserts that a POSITA would have "simply . . . follow[ed] the well-known overlay modernization approach." D.I. 21 at 42-43. However, as shown in Section III.A.3.a *supra*, there <u>was no "well-known overlay modernization approach"</u> – or, if there was, ThyssenKrupp failed to prove it.

Third, ThyssenKrupp asserts that "Inventor Friedli admitted that he was not the first to replace a conventional elevator control system with a destination dispatch control system and that this was not an 'invention.'" D.I. 21 at 44. This misstates Dr. Friedli's testimony. In reality, Dr. Friedli testified that "<u>nobody else did it before</u>" Schindler – i.e., modernize a conventional system to a destination

system. A9390:10-15. However, those early (1990s) Schindler conventional-to-destination modernizations used the inadequate solutions described in Section I above (e.g., split groups). They did <u>not</u> use the claimed Phased Modernization approach, as that approach was not introduced to market until 2002.[12]

Fourth, ThyssenKrupp notes that Schroeder talks about an "overlay application . . . as a first stage of a complete modernization program." D.I. 21 at 44. However, as discussed above, the "overlay" that Schroeder's article talked about <u>did not exist</u>, and <u>would not exist for another ten years</u>. A9394:18-19.

Fifth, ThyssenKrupp cites Lustig and Wolfe for the proposition that there was "market pressure for upgrading conventional-controlled elevators to newer technologies, such as destination dispatch." D.I. 21 at 45. However, neither of these articles said <u>anything</u> about destination dispatch. Moreover, ThyssenKrupp adduced no evidence to explain why "market pressure" to perform modernizations <u>in general</u> would lead a POSITA to the <u>particular solution</u> claimed. Furthermore, the only witness who testified about "market pressures" was Mr. McClendon. On cross-examination, Mr. McClendon admitted that he is "<u>not an expert</u> in [the] area"

---

[12] ThyssenKrupp appears to suggest that the "Marriott Marquis" modernization in New York was a "Phased Modernization." *See* D.I. 21 at 23. However, ThyssenKrupp adduced <u>absolutely no evidence</u> to prove this at trial. Moreover, Dr. Friedli testified at his deposition that this was <u>not</u> a Phased Modernization – rather, it was one that required "shut[ting] down the elevators" using Schindler's "classical Miconic 10" technique. A1434-1435 (325:8-327:5). Dr. Friedli specifically testified that the Marriott Marquis modernization did <u>not</u> use "the system that's described in the '465 and '861 patents." *Id.*

of "market forces in the elevator industry." A10224-10226. Thus, the evidence of "market forces" is entitled to little or no weight.

Finally, ThyssenKrupp asserts that "[Dr.] Friedli admitted that . . . any average elevator engineer could probably have come up with the ideas in his patents." D.I. 21 at 48. This <u>completely mischaracterizes</u> Dr. Friedli's testimony. What Dr. Friedli said was that, <u>if a POSITA were given the disclosures in the Patents-in-Suit</u>, they could <u>implement</u> the idea or the invention. A9462 ("After the <u>idea,</u> that was only engineering.") Dr. Friedli was talking about <u>enablement,</u> not obviousness. This was confirmed on redirect:

> Q.  Mr. Schmit asked you . . . "at the time that the '465 and the '861 patent applications were filed . . . <u>could any average elevator engineer have come up with the idea that's in the '465 and '861 patents?</u>
>
> "<u>Answer: At this time, I think no.</u>
>
> * * *
>
> Q:  Was that your testimony?
>
> A. This is the [i.e., my] opinion today.

A9485:19-A9487:13. Thus, Dr. Friedli did not "admit" that "any average elevator engineer could probably have come up with the ideas in his patents." D.I. 21 at 48.

In sum, ThyssenKrupp failed to adduce sufficient evidence from which a reasonable jury could conclude that "a person of ordinary skill at the time of the invention would have selected and combined [the] prior art elements in the normal course of research and development to yield the claimed invention." *Unigene Labs,*

*Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Thus, Inventio is entitled to judgment of nonobviousness.

### 7. This Court Should Grant Judgment of Nonobviousness

For the foregoing reasons, ThyssenKrupp failed to prove that the Asserted Claims are obvious. Therefore, Inventio is entitled to judgment of nonobviousness.

### B. Alternatively, This Court Should Grant a New Trial on Obviousness

### 1. Inventio Was Barred from Presenting its Evidence of Secondary Considerations

ThyssenKrupp misrepresents the district court's rulings on secondary evidence. ThyssenKrupp asserts that "[t]he Court did not say . . . that all evidence of secondary considerations was excluded, [just] that . . . such evidence was 'pretty weak.'" D.I. 21 at 53. ThyssenKrupp also asserts that Inventio could have asked for a "jury instruction . . . [on] secondary considerations," but failed to do so. *Id.*[13]

That is wrong. ThyssenKrupp's motion *in limine* no. 2 sought "to exclude any testimony or other evidence relating to Schindler's 'phased modernization' products," and to exclude all evidence of secondary considerations based on

---

[13] ThyssenKrupp does note that, during the pre-trial conference, the district court made a number of statements suggesting that Inventio had taken a "cavalier attitude towards complying with . . . the rules of discovery." D.I. 21 at 54-55. However, the district court made those statements without citing to any evidence on the record. In fact, a review of the case docket (A96-149) reveals that Inventio was not sanctioned for discovery violations at any point in the case below. *See* A10566. The only party who was sanctioned for discovery violations was ThyssenKrupp. *See* A864 (ordering ThyssenKrupp to pay attorneys' fees).

Phased Modernization.  A8043-8045. The Court's ruling on this motion was clear: "Defendant's Motion in Limine #2 is GRANTED." A9061.

Similarly, ThyssenKrupp's motion *in limine* no. 3 sought to exclude "any . . . evidence tending to suggest that ThyssenKrupp 'copied' Schindler's products." A8051-8053. This motion also sought to exclude a statement from an internal ThyssenKrupp memo that "DD [Destination Dispatch] overlay (similar to what Schindler is installing today)" – i.e. Phased Modernization – is an "<u>innovative leap in technology that will be easy to sell</u>." *See* A13537. Clearly, this statement was strong evidence of "praise by others" – indeed, praise by ThyssenKrupp itself.[14]

The Court's order on this motion was, "[t]he Court therefore GRANTS . . . Defendant's Third Motion in Limine, but will reconsider the matter if the Plaintiff puts on evidence that shows the Avenue of the Americas elevator modernization is an embodiment of the asserted patent claims." A8430. Inventio <u>did</u> put on such evidence – i.e., it had Dr. Friedli testify about the technical features of Phased Modernization, including the Phased Modernization at 1211 AoA.  D.I. 15 at 35-38. This testimony established that each element of, at least, the independent Asserted Claims was met by the 1211 AoA installation.  D.I. 15 at 40-42.

ThyssenKrupp asserts that Dr. Friedli's testimony failed to establish that Phased Modernization met "several critical claim limitations." *See* D.I. 21 at 50.

---

[14] At trial, the Court allowed this statement to be introduced for purposes of damages, but <u>not</u> for purposes of showing nonobviousness. *See* A9862-9868. This further prejudiced Inventio by excluding yet more relevant secondary evidence.

However, ThyssenKrupp simply lists these "limitations" – it does not provide <u>any argument or explanation</u> for how Dr. Friedli's testimony on them was "deficient." Moreover, the first "limitation" identified by ThyssenKrupp – "the alleged 'modernizing device' was actually disconnected from the car and hall call transmitters" – <u>does not exist</u> in any of the Asserted Claims. As shown in Inventio's Opening Brief, Dr. Friedli's testimony <u>did</u> establish that Phased Modernization met all the claim limitations. *See* D.I. 15 at 40-42.

After presenting that testimony, Inventio informed the Court that it planned to have Dr. Friedli go through the elements of the claims and show that "1211 Avenue of the Americas meets all the elements." A9345. This would have established the required "nexus," and thus opened the door for Inventio to introduce its evidence of secondary considerations. However, the court stated, "I think when Mr. Schmit starts objecting, <u>I'm going to start sustaining.</u>. . . And <u>knowing that you can't do it, then you shouldn't try</u>." A9346. That was a clear, unambiguous ruling – the court was sustaining its rulings on motions *in limine* 2 and 3, and barring Inventio from putting on evidence of commercial success, copying or other secondary considerations based on "Phased Modernization."[15]

Therefore, ThyssenKrupp's argument that Inventio simply "chose" not to put on such evidence is completely without merit.

_____

[15] This was confirmed by the district court's ruling on Inventio's motion for a new trial, in which the court stated "Plaintiff was trying to use a non-accused modernization project as evidence of copying and commercial success . . . the evidence <u>was properly barred.</u>" A41 (emphasis added).

### 2.    The Exclusion of Inventio's Secondary Evidence Was Error

It appears that this Court has never directly addressed the question presented here – i.e., to establish that a <u>patentee's own products</u> practice the claims of its patents, must the patentee put on <u>expert testimony</u> showing, on a claim element-by-claim element basis, that the patentee's product satisfies the claim?

However, in *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012), this Court came close. There, the claims recited a "dual-activity" feature for drilling rigs. *Id.* This Court found that the patentee adduced "sufficient evidence of both commercial success <u>and nexus</u>." *Id.* The evidence consisted of: (i) "two contracts . . . one for a dual-activity drilling rig and one for a single-activity rig," wherein the dual-activity rig commanded a higher price; and (ii) testimony from "Maersk's own employee show[ing] that customers request the dual-activity feature." *Id* at 1350. It does not appear that the patentee adduced expert testimony showing that its "dual-activity" feature was practiced by its own products – yet, the court found that "a reasonable jury could conclude that . . . [there was] a nexus" to commercial success. *Id.*

Furthermore, at least one district court has <u>expressly</u> held (*citing Transocean*) that a patentee is <u>not</u> required to adduce expert testimony to show the required nexus. *See Ecolab USA Inc. v. Diversey, Inc.*, No. 12-CV-1984(SRN/FLN), 2015 WL 2353018, at *5 (D. Minn. May 15, 2015). In *Ecolab*, the defendant moved *in limine* to exclude all evidence that the patentee's "EnCompass" product practiced its patents (for purposes of secondary

considerations). *Id.* at * 5. The defendant argued that such evidence must be excluded because the patentee's "liability expert[] fail[ed] to discuss [EnCompass's] practicing of the claimed invention as evidence of commercial success" in his expert reports. *Id.* The patentee responded that "their liability expert was not required to present testimony on the issue of commercial success because secondary considerations of obviousness may be established through fact witnesses and documents." *Id.*

"The Court agree[d] with Plaintiffs." *Id.* at * 6. The court noted that "Defendant was made aware of Plaintiffs' belief that the EnCompass system was covered by the Patents–in–Suit at least through their answer to Defendant's interrogatory." *Id.* Similarly, here, Inventio made ThyssenKrupp aware of its claim that SEC's Phased Modernization practiced the Patents-in-Suit in its April 30, 2010 Response to Interrogatory 3. A6366-6368, A6375.[16]

In *Ecolab,* the court found that the patentees "<u>were not required</u> to provide a claim-by-claim analysis of the EnCompass system,"[17] and "<u>were not required to</u>

---

[16] In fact, Inventio provided ThyssenKrupp with a <u>full list</u> of SEC's Phased Modernization jobs. A6366-6368. The second job on the list is "1211 Avenue of the Americas" – i.e., the job that ThyssenKrupp inspected and copied before developing its infringing system. *See* A6367.

[17] For this, the Court relied on *Morpho Detection, Inc. v. Smiths Detection, Inc.*, 957 F.Supp.2d 655, 674 n. 22 (E.D.Va. 2013). There, the defendant argued that patentee Morpho "through its expert Dr. Bell, was required by law to provide the equivalent of a claim by claim infringement analysis prior to Dr. Bell offering the opinion that Morpho's Itemizer 3 product was an embodiment of Morpho's own '670 patent." *Id.* The court <u>rejected</u> this argument, finding that defendant had "cite[d] no law in support of this contention, and instead relie[d] solely on cases

obtain an expert opinion on that issue." *Id.* (*citing Transocean*, 699 F.3d at 1350). "Rather, whether Ecolab's EnCompass system practices the Patents–in–Suit . . . [was] a question for the jury that can be established through fact witnesses and documents." *Id.* Thus, the court rejected the defendant's motion *in limine*.

Based on *Transocean*, *Ecolab* and *Morpho* (discussed below), Inventio was not required to have an expert "provide a claim-by-claim analysis" to show that SEC's Phased Modernization practiced the Patents-in-Suit. Therefore, the district court erred in finding that Inventio could not establish the required "nexus," and erred in barring all evidence of commercial success and copying.

ThyssenKrupp cites to a district court case, *LadaTech LLC v. Illumna, Inc.*, Civ. No. 09-627-SLR, 2012 WL 2153646, at *1 (D. Del. Jan. 24, 2012), supposedly for the proposition that expert testimony is required to show this "nexus." D.I. 21 at 52. However, that case did not address the issue presented here. In *LadaTech*, the defendant sought to exclude the testimony of the patentee's damages expert, "Melissa Bennis CPA," on commercial success. *Id.* In her expert report, she simply "assume[d] . . . that the accused products use the amplification method of the '023 patent." *Id.* Yet, the court found that this "assumption" was sufficient to establish the required "nexus." *Id.* The court denied the motion, and allowed Ms. Bennis to testify about commercial success. *Id.* Thus, if anything, *LadaTech* suggests there is no requirement for a claim-by-claim analysis to

---

discussing the necessary analysis before an expert is permitted to opine that a patent is infringed." *Id.* That is exactly the situation presented here.

establish the "nexus" for commercial success and copying. It certainly does not say that this must be done by an expert.

Moreover, this Court's cases make it clear that even in the context of infringement, expert testimony is <u>not</u> necessary *per se Meyer Intellectual Properties Ltd. v. Bodum, Inc*., 690 F.3d 1354, 1374 (Fed. Cir. 2012). Rather, "in <u>many</u> patent cases expert testimony will not be necessary because the technology will be 'easily understandable without the need for [an] expert.'" *Id.*

This was just such a case.[18] The technology at issue was elevators – something every layperson is familiar with. And, the claims are essentially "connection" claims – i.e., to determine whether the claims are met, the jury would simply have to determine whether the claimed elements ("modernizing device," "computing unit," etc.) were connected together in the claimed way.[19]

ThyssenKrupp asserts that "the District Court, in its discretion and based on all the facts. . made a 'judgment call' that the technology was sufficiently complex that expert testimony was necessary." D.I. 21 at 53. That is incorrect.

---

[18] ThyssenKrupp cites Inventio's remark, in opening statements, that the case would be "fairly complex," and that "it's going to be challenging." D.I. 12 at 53-54. Counsel was simply priming the jury about the difficulties of serving in <u>a patent case in general</u>. This did not represent any sort of admission that expert testimony was needed to show that "Phased Modernization" practices the claims.

[19] ThyssenKrupp asserts that "the proofs necessary to demonstrate a particular device or method was covered by the Inventio patents required more than simply showing "A connects to B connects to C," but provides no further analysis or support for this position. *See* D.I. 21 at 54, n. 28.

Although Inventio briefed this issue at every available opportunity, the district court never analyzed whether the technology was so complex as to require expert testimony. Inventio raised this argument in response to ThyssenKrupp's motions *in limine*. A8692-A8707. However, the court did not address it in its rulings. A13109-A13115. Inventio again raised this issue in its post-trial motions. A10609-A10611. Again, the district court did not address it, simply assuming that expert testimony was required. A41.

The district court appears to have been misled by ThyssenKrupp's out-of-context quotation from *LadaTech*. ThyssenKrupp quoted to the district court the out-of-context passage of *LadaTech* which states, "an expert must establish a nexus between that commercial success and the patented technology." A10659. What this passage meant was that assuming an expert is being proffered to testify about commercial success, that expert must make out a *prima facie* case of "nexus." *LadaTech,* 2012 WL 2153646 at * 1. This has nothing to do with whether an expert is the only person who can testify about the required "nexus." Yet, the district court appears to have taken ThyssenKrupp's out-of-context quote at face value, stating (based solely on *LadaTech*) that "an expert must establish a nexus," and then concluding that "the evidence was properly barred" because "Plaintiff failed to address this issue in any of its expert reports." A41.

Accordingly, the district court made a clear error of law when it concluded that expert testimony was the only way Inventio could have established that Phased

Modernization practiced the Patents-in-Suit. This error led it to erroneously exclude <u>all</u> of Inventio's evidence of copying and commercial success.

### 3.     The District Court's Error Was Not Harmless

Because the district court made a legal error in excluding evidence, a new trial should be ordered unless the error was "harmless." *Barker v. Deere & Co.,* 60 F.3d 158, 164 (3d Cir. 1995). Under Third Circuit law, an "error [is] harmless only if it is <u>highly probable</u> that the error did <u>not</u> affect the outcome of the case." *See Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 53 (3d Cir. 1989).

ThyssenKrupp asserts that the error was harmless because "Phased Modernization" was clearly in the prior art, and "ThyssenKrupp's prima facie obviousness showing was so strong that Inventio's proffered commercial success and copying 'evidence' would not have affected the outcome of the case." D.I. 21 at 56-57. Clearly, that is incorrect. As shown in Section III.A *supra*, ThyssenKrupp's *prima facie* obviousness case was weak. The secondary evidence would have been highly material to rebut what the jury (erroneously) found to be an adequate *prima facie* case. "When present, [secondary] factors may often be the most probative and cogent evidence of non-obviousness in the record." *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009).

Moreover, the evidence of secondary considerations in this case was very strong.  D.I. 15 at 43-47. ThyssenKrupp attempts to downplay the evidence of copying by asserting it "consisted solely of a letter from Inventio's counsel characterizing his view of the 'facts.'" D.I. 21 at 56. That "letter," however, was a

highly-detailed, nine-page singled-spaced document laying out the key evidence of copying. A5516-5524. The letter cited the specific documents, deposition testimony, photographs and other evidence that clearly showed ThyssenKrupp had copied SEC's Phased Modernization. *Id.* This is the evidence that Inventio would have presented at trial, had it not been erroneously barred by the district court.

On commercial success, ThyssenKrupp asserts that Inventio could not have offered evidence that its "sales were driven by the patented invention." D.I. 21 at 55-56. Again, that is incorrect. SEC's manager of modernization sales and marketing, Kris Sundberg, testified that "our phased modernization process was a large advantage for us, as well as the customer, to help us secure . . . work." A9806:19-9807:5. And, the elevator consultant for the Accused Installations, Kevin Huntington, was so impressed by Phased Modernization that he told ThyssenKrupp all future destination dispatch modernization jobs with his company would require the Phased Modernization approach. A9891:4-19, A13544.

In sum, the district court's erroneous exclusion of Inventio's secondary evidence likely influenced the outcome of the case. Thus, if this Court declines to grant judgment of nonobviousness, it should order a new trial on obviousness.

## C. This Court Should Grant Judgment of No Best Mode Violation as to the '861 Patent

### 1. No Reasonable Jury Could Have Found for ThyssenKrupp on the Subjective Prong

As shown in Inventio's Opening Brief, no reasonable jury could have found that Dr. Friedli had a subjective preference for the Echelon components in his

prototype modernizing device.  D.I. 15 at 49-51. ThyssenKrupp points to several parts of the trial record which, it asserts, support the jury finding on the subjective prong. Inventio addresses each in turn:

•    ThyssenKrupp notes that Dr. Friedli "had a specific working implementation . . .  of a prototype of the modernizing device using the converter 361." D.I. 21 at 59. That is true. However, "the particulars of making a prototype . . . do not necessarily equate with the 'best mode' of 'carrying out' an invention." *Wahl Instruments, Inc. v. Acvious, Inc*., 950 F.2d 1575, 1579 (Fed. Cir. 1991). Here, Dr. Friedli did not have a subjective preference for the Echelon components in his prototype; thus, the prototype was not a "best mode."  D.I. 15 at 49-51.

•    ThyssenKrupp notes that the two Echelon parts, FTT-10A and Neuron 3150, "must be used together," and that Dr. Friedli knew this. D.I. 21 at 59. This is true. However, <u>everyone</u> in the industry knew this, because these parts were made and marketed by Echelon as a "matched pair." A9434:11-15. Even Mr. McClendon admitted that these chips were commercially available at the time. A10215-10216.

•    ThyssenKrupp asserts that Dr. Friedli "knew Echelon did not sell something that could be used as a signal converter made up of a transceiver coupled with a microprocessor." D.I. 21 at 59. <u>That is wrong</u>. Dr. Friedli testified that the "conversion" function of his prototype "modernizing device" was performed by the Echelon Neuron 3150 chip coupled with the FTT-10A transceiver. A9433:21-A9434:15.

- ThyssenKrupp asserts that Dr. Friedli "had a preference for using the FTT-10A," and that the FTT-10A and Neuron 3150 were "the best way he knew of for implementing converter 361." D.I. 21 at 59-60. That is simply not true. Dr. Friedli testified that the "best" network protocol he knew of to implement the "converter" function was "Ethernet" – which is disclosed in the Patents-in-Suit. A9448:9-15. However, Dr. Friedli was essentially "locked" into using the Echelon equipment, not because he thought it was better, but because it was the only equipment compatible with Schindler's pre-existing destination dispatch floor terminals and computing unit. A9448:1-12. Thus, the Echelon equipment was not Dr. Friedli's preferred way of implementing the invention.

ThyssenKrupp asserts that Inventio's reliance on the *Teleflex* case is misplaced, because *Teleflex* dealt with "unclaimed subject matter." D.I. 21 at 60-61. However, this case also deals with unclaimed subject matter. The Asserted Claims do not recite any details about how the "converting" function is performed. In fact, the claims do not recite a "converter" at all – they simply say that the modernizing device must "convert" the relevant signals. Thus, the selection of particular equipment to perform this function (Echelon, Ethernet, etc.) is just like the selection of the "hardness" and "thickness" of the clip in *Teleflex* – i.e., it is unclaimed subject matter. *Id.*

ThyssenKrupp also asserts that, assuming the "Neuron 3150 + FTT-10A" is "unclaimed subject matter," it is still best mode information, because it bears a "strong relationship to the claimed invention." D.I. 21 at 61. That is the wrong

legal standard. Under the correct standard, "an inventor need not disclose a mode for obtaining unclaimed subject matter unless the subject matter is <u>novel and essential</u> for carrying out the best mode." *Eli Lilly & Co. v. Barr Laboratories, Inc.,* 251 F.3d 955, 963 (Fed. Cir. 2001). As shown in Inventio's Opening Brief, the "Neuron 3150/FTT-10A" combination was neither novel nor essential to practicing the claimed invention. D.I. 15 at 49-51. Thus, Dr. Friedli's use of this equipment is not "best mode" information.

Thus, no reasonable jury could have found for ThyssenKrupp on the subjective prong.

### 2. No Reasonable Jury Could Have Found for ThyssenKrupp on the Objective Prong

ThyssenKrupp notes that the Patents-in-Suit do not expressly identify the Neuron 3150 and FTT-10A. D.I. 21 at 61-62. That is true. However, that does not end the inquiry. Rather, the objective prong asks "whether the specification discloses sufficient information such that one reasonably skilled in the art could practice the best mode." *In re Cyclobenzaprine*, 676 F.3d at 1085.

The Patents-in-Suit instruct a POSITA to implement the converter using any "commercially available and proven converter of the electronics industry." Dr. Koopman stated, in unrebutted testimony, that any POSITA (reading the Patents-in-Suit) would have been led to consider implementing the "conversion" function with the Echelon equipment. A10302:4-10303:5. That is because, based on Dr. Koopman's personal experience working as an engineer in the elevator industry in

the 1990s, those were "well-known components [which] would have been pretty high in the list of things to look at in the elevator industry." *Id.*

ThyssenKrupp asserts that "Inventor Friedli . . . admi[tted] . . . there was not commercially available a converter that could convert a destination signal into a call report." D.I. 21 at 62. That is not true. What Dr. Friedli testified was that, although the Neuron 3150 and FTT-10A were commercially available, one could not purchase them <u>preprogrammed</u> with the specific "conversion table" that would take in serial "destination/boarding floor" data and send discrete outputs to the old car controller. A9443-9445. Rather, one would first have to do some "low-level configuring" to build this "conversion table." *Id.*

ThyssenKrupp's <u>own expert</u>, Mr. McClendon, admitted that a POSITA would have been able to perform this "low level configuring." A10088:6-11. This was confirmed by Dr. Koopman. A10302-303. Therefore, the undisputed evidence is that a POSITA would have been able to implement the converter as an FTT-10A/Neuron 3150 pair, and would have been led to do so.

ThyssenKrupp cites *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1532, 1535 (Fed.Cir. 1987) for the proposition that "if applicant develops specific instrumentalities or techniques which are recognized . . . as the best way of carrying out the invention," they must be disclosed. That case is inapposite, because Dr. Friedli did not "develop" an "instrumentality or technique" to perform the "conversion" function that he "recognized as the best way of carrying out the invention." Rather, he simply purchased off-the-shelf Echelon equipment, and did

some "low level configuring." This is in contrast to *Spectra-Physics*, where the inventors developed a "TiCuSil brazing" technique that was "critical" to the invention, and "contrary to . . . the use of TiCuSil" generally understood in the art, but failed to disclose that technique. *Id.* at 1536.

Accordingly, no reasonable jury could have found for ThyssenKrupp on the objective prong. As such, this Court should grant judgment of no best mode violation as to the '861 patent.

### D.    This Court Should Grant Judgment of Infringement as to the Asserted Claims of the '861 Patent

ThyssenKrupp asserts that the jury could have reasonably found the claim element "a device for temporarily operating an elevator installation during modernization" in '861 patent, claim 1 was not met in the Accused Installations. D.I. 21 at 64-66. That is incorrect.

ThyssenKrupp argues that, under the claim, the "device" of the preamble consists of both the "modernizing device" and the "computing unit." D.I. 21 at 64-65.[20] Meanwhile, the court construed "temporarily" to mean "removed after modernization is complete." A95. ThyssenKrupp asserts that this means, to satisfy the claim, both the "modernizing device" and the "computing unit" must be removed after modernization. D.I. 21 at 64-65.

---

[20] ThyssenKrupp asserts that Dr. Koopman "agreed" with this construction. *See* D.I. 21 at 65. That is incorrect. Dr. Koopman testified that this claim element was satisfied even though the "computing unit" – the "new destination dispatch CPU" - was not removed after modernization. *See* A9658-9659.

It is undisputed that ThyssenKrupp's "modernizing device" ("Destination Dispatch Overlay CPU + Overlay Interface") was removed at the end of modernization, and its "computing unit" ("Destination Dispatch CPU") was not removed. A10144:10-23. Thus, ThyssenKrupp asserts, the entire claimed "device" was not removed, and a reasonable jury could have found no infringement.

There are no facts in dispute on this issue. Rather, it is purely an issue of claim construction – does removal of just the "modernizing device" satisfy the claim, or must the "computing unit" also be removed? The district court never resolved this claim construction issue; thus, it falls to this Court.

ThyssenKrupp's proposed construction does not make sense in view of the patented invention. The <u>entire point</u> of the invention is to end up with a <u>permanent</u> upgrade to destination dispatch. If ThyssenKrupp's proposed construction were correct, the only way to practice the claims would be to install destination dispatching, go through the entire process of modernization – and then <u>rip everything out</u> and go back to conventional dispatching. That makes no sense.

Instead, what the claims mean by "temporarily" is that the <u>modernizing device</u>" is used during modernization, and then removed. That makes sense, because the modernizing device is <u>intended</u> to be temporary. Moreover, '861 patent, claim 1 states that the "<u>modernizing device</u> [is] temporarily connected to the elevator control," but has <u>no such requirement</u> for the "computing unit."

Accordingly, the "device for temporarily operating . . ." claim element does not require removal of the "computing unit," and no reasonable jury could have found that this claim element was not met.

Second, ThyssenKrupp asserts that the jury could have reasonably found that the claim element "the elevator control being disconnected from the . . . car call transmitters" was not present in the Accused Installations.  D.I. 21 at 66-67. ThyssenKrupp asserts that "there was no evidence . . . that the elevator controls in the accused ThyssenKrupp installations actually ever stopped operating based on an input from the car call transmitters." D.I. 21 at 67. That is wrong.

As Inventio showed in its Opening Brief, the evidence was <u>unrebutted</u> that when the "DSC Auxiliary Relay" was on at the Accused Installations, the car call buttons were <u>completely disabled</u>, and the old elevator controllers <u>could only respond to input from the modernizing devices.</u>  D.I. 15 at 55-57. Various ThyssenKrupp witnesses testified to this, and it was confirmed by Dr. Koopman. *Id.* Therefore, for all the reasons set forth in Inventio's Opening Brief, no reasonable jury could have found that this claim element was not present.

Therefore, Inventio is entitled to judgment of infringement as a matter of law as to the Asserted Claims of the '861 patent.

## E.  <u>This Court Should Affirm the Findings of Infringement as to the '465 Patent</u>

Infringement is a question of fact which this Court reviews for substantial evidence. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., 711 F.3d

1348, 1377 (Fed. Cir. 2013). The jury's verdict that the Asserted Claims of the '465 Patent were infringed must stand, unless the evidence was so one-sided as "to require a reasonable jury to find as a factual matter only noninfringement." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1319 (Fed. Cir. 2009).

ThyssenKrupp asserts that no reasonable jury could have found the claim element "floor terminal . . . for . . . the input of destination call reports" was present in the Accused Installations. D.I. 21 at 72-74.

ThyssenKrupp's argument is based on the district court's construction of "destination call report," which was "data signal providing passenger conveying information that identifies the boarding floor and the destination floor." A93. ThyssenKrupp asserts that the conjunctive "and" means that the claim requires a user to manually type in his own boarding floor at the floor terminal. D.I. 21 at 72-74. The kiosks at the Accused Installations did not allow users to type in their own boarding floor. *Id.* Thus, ThyssenKrupp argues, there was no infringement. *Id.*

This argument makes no sense. ThyssenKrupp is asserting that Inventio's patent requires a user to walk up to a floor terminal at floor X, type in to the terminal, "I am on floor X," and only then type in their destination floor. Nothing in the Patents-in-Suit even remotely suggests such a requirement. No elevator system in the world would require a user to manually tell the system which floor they are already on. Mr. McClendon admitted this in his deposition. A5229:4-8. ("Have you ever seen an elevator system that requires a passenger to manually enter their specific boarding floor? A. No.")

Meanwhile, Dr. Koopman showed that when a user entered a destination floor at a kiosk in the Accused Installations, the result was a signal identifying <u>both</u> the passenger's boarding <u>and</u> destination floors. The manual for ThyssenKrupp's Accused Installations states that each kiosk has an IP address, wherein "[t]he Kiosk IP address will begin at 192.168.0.10, and will be assigned from the bottom floor to the top floor." A13700. Thus, for example, when the computing unit receives a signal from the kiosk with address "192.168.0.10," <u>it knows that signal came from the bottom floor</u>. *Id.* As Dr. Koopman testified, when a user input a destination floor, the kiosk sent a "data signal" to the computing unit. A9797:7-24. Such a signal <u>always</u> included the IP address of the originating kiosk – thus, it <u>always</u> identified which kiosk the signal came from and, accordingly, <u>which boarding floor</u> the signal came from. A9624:17-21, A9627:15-19.

Thus, substantial evidence supported the jury's verdict that the Accused Installations met the requirement of "input of destination call reports." ThyssenKrupp's hyper-technical parsing of "input" versus "output" ignores the key issue[21] – the claims <u>do not require</u> a user to <u>manually</u> input his boarding floor.

Accordingly, the jury's and district court's finding of infringement as to the Asserted Claims of the '465 Patent should be affirmed.

---

[21] Dr. Koopman's testimony was clear that "input of destination call reports" means input <u>into the overall system</u>, not into the floor terminal itself. A9628:4-12.

### F.    This Court Should Affirm the Finding of No Inequitable Conduct

ThyssenKrupp asserts inequitable conduct based on "intentional concealment of the best mode coupled with a false mode." The district court found no inequitable conduct. A49-A50. That finding should be affirmed.

In reviewing inequitable conduct, this Court reviews a district court's "underlying factual determinations of materiality and intent for clear error, and . . . the ultimate decision as to inequitable conduct for an abuse of discretion." *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1334 (Fed.Cir. 2011).

Under *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011), inequitable conduct can only be found if the challenger shows that the applicant: (i) "misrepresented or omitted material information;" and (ii) had a "specific intent to deceive the PTO." *Id.* at 1287. "The accused infringer must prove both elements - intent and materiality - by clear and convincing evidence." *Id.* Intent may not be inferred from materiality. *Id.* at 1290.

Furthermore, "in order for a best mode violation (if it occurred) to serve as the basis for a finding of inequitable conduct, there must be some added culpable conduct, such as disclosing a fictitious mode instead of the best mode." *Osram Sylvania, Inc. v. Am. Induction Technologies, Inc.*, CV 09-8748-R, 2011 WL 5143630 at * 12 (C.D. Cal. Oct. 28, 2011).

ThyssenKrupp asserts that Dr. Friedli disclosed a "false mode" by "represent[ing] in his patents that converter 361 was 'a commercially available and proven converter of the electronics industry.'" D.I. 21 at 76-79. As shown in

Section III.C *supra*, that statement was not "false" – there were "commercially available and proven converters" that could serve as the "converter 361." However, even if there were not, there would still be no inequitable conduct, because the mere reference to "commercially available and proven converters" is not a "mode," let alone a "false mode," as these terms are used in the case law.

ThyssenKrupp cites *Consol. Aluminum Corp. v. Foseco Intern. Ltd.,* 910 F.2d 804 (Fed. Cir. 1990), on the "false mode" issue. In that case, the inventors knew of a "best mode" slurry containing at least six ingredients. *Id.* at 807-808. The patent, however, disclosed a slurry omitting at least three key ingredients, and stating false proportions for others, which the inventors knew would render the slurry inoperative. The inventors thus intentionally disclosed a false mode that they knew would be "unworkable." *Id*. This Court relied on those facts to affirm the district court's finding of inequitable conduct. *Id.*

Here, by contrast, the Patents-in-Suit do not list specific details, let alone "knowingly inoperative" or misleading details, about what should be used as the "converter 361." Thus, there is clearly no "false mode" in this case.

Furthermore, ThyssenKrupp adduced no evidence that Dr. Friedli had a specific intent to deceive the USPTO. ThyssenKrupp notes that Dr. Friedli testified he "would never put the part numbers into his patent." A10691. But, "[i]t is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability." *Allied Colloids Inc. v. Am. Cyanimid Co.*, 64 F.3d 1570, 1578 (Fed.Cir.1995). And, "the best mode

requirement does <u>not</u> extend to production . . . or routine details." *Eli Lilly & Co.*, 251 F.3d at 963. Dr. Friedli correctly believed that "specific part numbers" are production details that are <u>not</u> required to be disclosed in patent specifications. Thus, there is no evidence of intent to deceive.

For at least the foregoing reasons, the Court's finding of no inequitable conduct should be affirmed. Also, since there was no inequitable conduct, there is no basis for an "exceptional case" finding, and the court's determination that this was not an "exceptional case" should be affirmed.

## IV.    CONCLUSION

For the foregoing reasons, and the reasons set forth in Inventio's Opening Brief, Inventio respectfully requests that the Judgment be overturned, that a Judgment of Infringement and No Invalidity be entered in favor of Inventio, that this case be remanded for proceedings on a permanent injunction, that all other relief requested by Inventio in this appeal be granted, and that this Court grant such further and other relief as it deems necessary and proper.

Dated:  June 5, 2015                 Respectfully submitted,


                                     */s/ Pierre R. Yanney*

                                     Pierre R. Yanney
                                     STROOCK & STROOCK & LAVAN LLP
                                     180 Maiden Lane
                                     New York, New York 10038
                                     Tel:  (212) 806-5400
                                     Fax:  (212) 806-6006

                                     Counsel for Plaintiff-Appellant

                                     INVENTIO AG

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | Jun 5, 2015 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Pierre R. Yanney | | /s/ Pierre R. Yanney |
Name of Counsel                                 Signature of Counsel

Law Firm   Stroock & Stroock & Lavan LLP

Address   180 Maiden Lane

City, State, ZIP   New York, NY 10038

Telephone Number   212-806-5858

FAX Number   212-806-6006

E-mail Address   pyanney@stroock.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

### CERTIFICATE OF COMPLIANCE WITH
### TYPE-VOLUME LIMITATION, TYPEFACE
### <u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b).  The brief contains 13958 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman typeface.


Dated:  June 5, 2015

                                                                 */s/ Pierre R. Yanney*
                                                                  Pierre R. Yanney

                                                                  Counsel for Plaintiff-Appellant
                                                                  INVENTIO AG